Irv Ackelsberg, PA Bar# 23813
John J. Grogan, PA Bar# 72443
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
iackelsberg@langergrogan.com
Appearing *Pro Hac Vice*

Deepak Gupta, D.C. Bar #495451
(*pro hac vice applied for*)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Tel: (202) 588-1000
Fax: (202) 588-7795
dgupta@citizen.org

(Additional Plaintiffs' Counsel on Signature Page)

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA SMITH, LOIS ARTZ, ASHLEY HENDERSON, JANA SPERLING and TONI NEILSON, on their own behalf and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.                    :<br><br>LEVINE LEICHTMAN CAPITAL PARTNERS, INC., LEVINE LEICHTMAN CAPITAL PARTNERS III, LP., LEVINE LEICHTMAN CAPITAL PARTNERS III, LLC, MICHAEL SCHRECK, BRETT STOHLTON and NATIONAL CORRECTIVE GROUP, INC (dba "Corrective Solutions"),<br><br>        Defendants. | Civ. No. 3:10-cv-0010 JSW<br><br>CLASS ACTION<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO NATIONAL CORRECTIVE GROUP, INC's MOTION TO DISMISS FIRST AMENDED COMPLAINT  [Docket No. 26]<br><br>Date: June 18, 2010<br>Time: 9:00 a.m.<br>Courtroom 11 |

# TABLE OF CONTENTS

Introduction ...................................................................................................................1

Statement of the Issues and Summary of Argument ...............................................2

Allegations of the Complaint .....................................................................................2

Argument .......................................................................................................................5

I.   NCG Is A Debt Collector Covered By the Fair Debt Collection Practices Act. ...............6

    A.   Defendants are "debt collectors" and were collecting "debt." ........................7

    B.   The FDCPA and the BCDA are not incompatible and, in any event, the Supremacy Clause does not permit debt collectors to ignore federal law. ...............10

    C.   The 2006 amendment to the FDCPA makes clear that private companies like NCG are debt collectors and are, absent the satisfaction of stringent conditions, covered by the FDCPA. ..................................................12

II.   NCG Is Not Entitled to Qualified Immunity. ..................................................13

III.   Abstention Is Unwarranted. .......................................................................17

    A.   This suit would not displace review of a state administrative agency by a particular state court with specialized expertise. ...........................................19

    B.   This suit does not primarily involve state law, and the state-law issues presented are unexceptional. ..........................................................20

    C.   This suit would not disrupt state efforts to establish a coherent policy. ..................21

    D.   Dismissal on abstention grounds is impermissible in a damages suit. ......................22

Conclusion ..................................................................................................................23

1

# TABLE OF AUTHORITIES

2
**Cases**

3
*Ace Beverage Co. v. Lockheed Information Management Services*, 144 F.3d 1218 (9th Cir. 1998) .........17

4
*Alabama Public Service Commission v. Southern Railway*, 341 U.S. 341 (1951) ....................................22

5
*Almodovar v. Reiner*, 832 F.2d 1138 (9th Cir. 1987) ...................................................24

6
*Ankenbrandt v. Richards*, 504 U.S. 689 (1992) ...........................................................21

7
*Bass v. Stolper, Koritzinsky, Brewster & Neider*, 111 F.3d 1322 (7th Cir. 1997)....................8, 9

8
*Bibeau v. Pacific Northwest Research Found. Inc.*, 188 F.3d 1105 (9th Cir. 1999) ....................17

9
*Bradley v. Medical Bd.*, 56 Cal. App. 4th 445 (Cal. App. 4th Dist. 1997)....................................18

10
*Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260 (9th Cir. 1996) .................................11

11
*Brown v. Budget Rent-A-Car Systems, Inc.*, 119 F.3d 922 (11th Cir. 1997) ..............................10

12
*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) ..................................................................*passim*

13
*Charles v. Lundgren & Assocs., P.C.*, 119 F.3d 739 (9th Cir. 1997) ....................................9, 10

14
*City of Tucson v. U.S. West Communications, Inc.*, 284 F.3d 1128 (9th Cir. 2002)..............2, 22

15
*Del Campo v. Kennedy*, 491 F. Supp. 2d 891 (N.D. Cal. 2006)........................2, 7, 8, 10

16
*Del Campo v. Mealing*, Civ. No. 01-21151 JW (N.D. Cal. July 7, 2006) ........................2, 20

17
*Duffy v. Landberg*, 133 F.3d 1120 (8th Cir. 1998) ....................................................10

18
*F.T.C. v. Check Investors, Inc.*, 502 F.3d 159 (3d Cir. 2007)........................................8, 10

19
*Fragoso v. Lopez*, 991 F.2d 878 (1st Cir. 1993) ..........................................................23

20
*Frey v. Gangwish*, 970 F.2d 1516 (6th Cir. 1992) ........................................................8

21
*Gonzalez v. Spencer*, 336 F.3d 832 (9th Cir. 2003) ....................................................18

22
*Gradisher v. Check Enforcement Unit, Inc.*, 133 F. Supp. 2d 988 (W.D. Mich. 2001)............7, 8, 9

23
*Gross v. Weingarten*, 217 F.3d 208 (4th Cir. 2000) ..................................................26

24
*Halvorsen v. Baird*, 146 F.3d 680 (9th Cir. 1998) ..................................................17, 18

25
*Hamilton v. ACCS*, 2006 WL 3332828 (N.D. Ind. 2006)........................................20, 21

26
*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..............................................................19

27
*Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367 (11th Cir. 1998) ........................10

28
*In re Baumblit*, 15 Fed. Appx. 30 (2d Cir. 2001) ....................................................19

1    *In re Reisen*, 2004 WL 764628 (Bkrtcy. N.D. Iowa 2004) ................................................19

2    *In re Simonini*, 272 B.R. 604 (Bankr. W.D.N.C. 2002) ..............................................19

3    *Int'l Brotherhood of Electrical Workers v. Public Service Commission*, 614 F.2d 206 (9th Cir. 1980) 24

4    *Irwin v. Mascott*, 112 F. Supp. 2d 937 (N.D. Cal. 1999) ...........................................19

5    *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000) .................................................18

6    *Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) .............................................................9

7    *Kirkbride v. Continental Cas. Co.*, 933 F.2d 729 (9th Cir. 1991) .............................24

8    *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374 (9th Cir. 1982).......22, 24

9    *New Orleans Publice Service., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) .....................23, 26

10    *Nucor Corp. v. Nebraska Public Power District*, 891 F.2d 1343 (8th Cir. 1989) ...........23

11    *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ..........................................21, 26

12    *Richardson v. McKnight*, 521 U.S. 339 (1997) .......................................2, 16, 17, 18

13    *Rosario v. American Corrective Counseling Services, Inc.*, 506 F.3d 1039 (11th Cir. 2007) .................6, 7

14    *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226 (4th Cir. 2007) .............................19, 20

15    *Schwarm v. Craighead*, 233 F.R.D. 655 (E.D. Cal. 2006)............................................25

16    *Schwarm v. Craighead*, 552 F. Supp. 2d 1056 (E.D. Cal. 2008) .........................8, 11, 13, 19

17    *Snow v. Jesse L. Riddle, P.C.*, 143 F.3d 1350 (10th Cir. 1998) ...............................10

18    *Tucker v. First Md. Sav. & Loan, Inc.*, 942 F.2d 1401 (9th Cir. 1991) ...................22, 24

19    *United States v. Morros*, 268 F.3d 695 (9th Cir. 2001) .........................................20, 26

20    *Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697 (5th Cir. 1999) ..............................26

21    *Wyatt v. Cole*, 504 U.S. 158 (1992) ...........................................................................17

22    *Younger v. Harris*, 401 U.S. 37 (1971) ....................................................................21

23

**Federal Statutes**

24

25    Fair Debt Collection Practices Act,

26        15 U.S.C. § 1692(e) ...................................................................................................8

       15 U.S.C. § 1692a(5) ...............................................................................................8

27        15 U.S.C. § 1692a(6) ...............................................................................................9

28

15 U.S.C. § 1692e(7) .................................................................................. 4

15 U.S.C. § 1692e(10) .............................................................................. 12

15 U.S.C. § 1692e(11) .............................................................................. 12

15 U.S.C. 1692e(14) ................................................................................. 12

15 U.S.C. § 1692f(1) ................................................................................. 12

15 U.S.C. § 1692g(a) ............................................................................... 12

15 U.S.C. § 1692k(a) ............................................................................... 26

15 U.S.C. § 1692k(c) ........................................................................... 19, 20

15 U.S.C. § 1692n .................................................................................... 13

15 U.S.C. § 1692p ............................................................................... 13, 15

15 U.S.C. § 1692p(a)(2)(B) ...................................................................... 15

15 U.S.C. § 1692p(a)(2)(C)(i) ................................................................... 14

15 U.S.C. § 1692p(a)(2)(C)(ii) .................................................................. 15

15 U.S.C. § 1692p(a)(2)(C)(iv) ................................................................ 14

15 U.S.C. § 1692p(a)(2)(C)(v) .................................................................. 15

**State Statutes**

Cal. Penal Code § 476a .......................................................................... 3, 4

Cal. Penal Code § 1001.60 .................................................................... 3, 14

Cal. Penal Code § 1001.62 ................................................................. 3, 4, 14

Cal. Penal Code § 1001.63 ........................................................................ 13

Cal. Penal Code § 1001.64 ..................................................................... 3, 6

Cal. Penal Code § 1001.64(b) .................................................................... 6

Cal. Penal Code § 1001.65 ......................................................................... 4

1

## Regulatory Materials and Secondary Sources

2

Federal Trade Commission, *Statements of General Policy or Interpretation: Staff*

3
   *Commentary on the Fair Debt Collection Practices Act*, 53 Fed. Reg. 50097-02 (1988)...................4, 8

4

Brief of the States of New York, et al. as *Amici Curaie* in Support of Petitioner in
   No. 08-1200, *Jerman v. Carlisle*, 2009 WL 3143708 (U.S. S.Ct., filed Sept. 28, 2009) ............3, 4, 14

5

6
Gordon G. Young,
   *Federal Court Abstention and State Administrative Law from Burford to Ankenbrandt: Fifty*

7
   *Years of Judicial  Federalism under Burford v. Sun Oil and Kindred Doctrines,*
   42 DePaul L. Rev. 859 (1993) ...............................................................................................................19

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant National Corrective Group (NCG) is a private debt-collection company that collects dishonored checks on behalf of retail merchants in California and other states. Unlike other collection agencies, however, NCG rents out the name and authority of local prosecutors. Armed with what its marketing copy openly touts as "the district attorney brand," NCG holds itself out as the prosecutor, sending letters to consumers on official letterhead, threatening them with criminal prosecution, and coercing them into paying exorbitant collection fees well in excess of limits set by state law. NCG keeps the lion's share of the fees for itself.

Until 2009, this debt-collection enterprise was known as American Corrective Counseling Services (ACCS). ACCS's aggressive collection tactics attracted criticism from consumer advocates, the media, regulators, and courts nationwide.[1] In direct response to class actions against ACCS in four federal district courts—and on the eve of a summary-judgment hearing in one of those cases—ACCS filed bankruptcy and liquidated itself. Since April 2009, following a bankruptcy asset purchase, the same enterprise has been operating under NCG's ownership, doing business as "Corrective Solutions."

This civil RICO suit alleges, among other things, that NCG's activities violate the Fair Debt Collection Practices Act (FDCPA)—the principal federal law that protects consumers from aggressive debt collectors. This case does not come to the Court on a blank slate. Indeed, NCG's motion to dismiss (Doc. No. 25) raises three defenses—contesting its coverage under the FDCPA and invoking the doctrines of qualified immunity and abstention—all of which echo arguments that have already been rejected in the prior litigation involving ACCS.

---

[1] *See, e.g., Bounced Checks: How Local District Attorneys Get a Cut of the Debt Collection Business*, http://www.propublica.org/feature/bounced-checks-how-local-das-get-a-cut-of-the-debt-collection-business; Pro Publica, May 2, 2009; *Bounced-check collection deal draws fire*, CNN Special Investigations Unit, May 2, 2009, http://www.cnn.com/2009/US/03/02/siu.bad.checks/index.html.; *District Attorneys Can Keep Cashing In On Check Fees*, Pro Publica, April 7, 2009, http://www.propublica.org/article/district-attorneys-can-keep-cashing-in-on-debt-collection-fees-0407; *Bad Check Isn't Grounds for Abuse*, Seattle Post-Intelligencer, May 13, 2006 (2006 WLNR 8426232); *Bad check prompts chaos: Prosecutor's restitution program deceiving*, Orlando Sentinel, June 11, 2006 (2006 WLNR 9978358); *Bounced-Check Collector Sued: Private Company Allegedly Disguised Itself as District Attorney, Threatened Arrest*, Santa Rosa Democrat, April 5, 2006 (2006 WLNR 12147760).

1

**STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT**

2
    **1.  Is NCG subject to the Fair Debt Collection Practices Act?** An unbroken line of

3
federal courts have confronted this question and have held that private corporations operating

4
check-collection programs under contract with local prosecutors are debt collectors covered by the

5
Act. NCG, like its predecessor ACCS, "is a private actor attempting to take action to collect a debt

6
against private individuals in order to compensate third party creditors, and thus, is bound by the

7
requirements of the FDCPA." *Del Campo v. Kennedy*, 491 F. Supp. 2d 891, 902-03 (N.D. Cal. 2006).

8
    **2.  Is NCG entitled to qualified immunity?** As the Ninth Circuit explained in an

9
appeal involving ACCS, private corporations do not acquire qualified immunity by performing

10
arguably governmental functions. "[I]n the qualified immunity context," such a "functional

11
approach" is unwarranted; "'government and private industry may engage in fundamentally similar

12
activities,' even though private entities are not entitled to immunity." *Del Campo v. Kennedy*, 517 F.3d

13
1070, 1080 (9th Cir. 2008) (quoting *Richardson v. McKnight*, 521 U.S. 339, 409 (1997)). And even if

14
immunity were available, it is "questionable" that NCG's activities—akin to "to debt collection

15
rather than to law enforcement"—are a "government function." *Id.* at 1079 n.12.

16
    **3. Should this Court abstain?** NCG contends that the Court should abstain based on

17
vague notions of comity and federalism and under the *Burford* absention doctrine. This argument,

18
too, was unsuccessfully raised by ACCS. *See* Order Denying Motion Based on Abstention in *Del*

19
*Campo v. Mealing*, Civ. No. 01-21151 JW (N.D. Cal. July 7, 2006) (attached as Exhibit 1). It is also

20
contrary to binding Ninth Circuit precedent. *See City of Tucson v. U.S. West Commc'n, Inc.*, 284 F.3d 1128,

21
1133 (9th Cir. 2002).

22

**ALLEGATIONS OF THE COMPLAINT**

23
    **Overview of NCG's Collection Activities.**  National Corrective Group, Inc, doing

24
business as "Corrective Solutions," is a private debt-collection company that collects dishonored

25
checks on behalf of retail merchants in over a dozen states. First Amended Complaint (FAC) ¶ 2.

26
Major retailers and debt collectors use NCG to collect dishonored checks. FAC ¶ 59. Merchants,

27
typically national retailers like Target and Safeway, as well as large debt collection companies, such

28
as Telecheck, refer dishonored checks directly to NCG for collection.  FAC ¶¶ 3, 59.  NCG sends the

check writer a series of standardized collection letters demanding the face amount of the check plus various fees to avoid the risk of prosecution or jail. FAC ¶¶ 23, 57, 72, 73, 77. NCG conducts this collection activity under contract with local district attorneys, claiming to be an official "district attorney bad check restitution program. ¶ 2. (Plaintiffs do not allege that local district attorneys generally know what action NCG takes in a particular case. To the contrary, one of the many problems with NCG's practices is the lack of any meaningful district-attorney involvement before NCG makes threats of prosecution.)

**California's Bad Check Diversion Act.**  In 1985, California enacted its Bad Check Diversion Act (BCDA), Cal. Penal Code § 1001.60, et seq., authorizing district attorneys to establish pre-trial diversion programs for fraudulent check offenses.  The BCDA is limited to cases in which there is probable cause to believe that the check writer violated California Penal Code § 476a—i.e. passing a check with the intent to defraud the merchant. *See* Cal. Penal Code § 1001.60.  If a D.A. determines there is probable cause, he or she must then assess five statutorily mandated factors to determine whether to refer a case to the diversion program. Cal. Penal Code § 1001.62.  The D.A. may enter a written agreement with the check writer to forego prosecution, conditioned on: (1) Completion of a diversion class conducted by the district attorney or a private entity; (2) Payment to the check recipient of full "restitution," defined as payment of the check amount plus any bank charges incurred; and (3) payment of the diversion fees specified in the BCDA.  Penal Code § 1001.64.  The only fees authorized by the BCDA are an administrative fee and the actual bank charge incurred by the merchant submitting the check. Penal Code § 1001.65; FAC, ¶¶ 37-45.

**NCG's Failure to Comply with the Diversion Act.** NCG's collection activity does not comply with the BCDA. In most cases, the merchants and private collection agencies transmit to NCG information that is insufficient to make a probable-cause determination under Penal Code § 476a, or to consider the factors under Penal Code § 1001.62. FAC ¶¶ 59, 60. No matter what information is provided by the merchant, NCG's program is designed such that district attorneys do not, in fact, assess probable cause, consider the five mandatory statutory factors, or make any "referral" to the "diversion program." FAC ¶¶ 61, 62. Moreover, NCG assesses and collects from consumers unauthorized fees, including a "Diversion Seminar Fee" typically of $165 or more, a $10

"convenience fee" for electronic payments, a $25 "class rescheduling" fee, a $10 late payment fee, and a $5 "overpayment/handling" fee.  FAC ¶ 54.

**NCG's Threats and Misrepresentations to Consumers.** Nothing in the BCDA authorizes a private debt-collector to make misrepresentations of fact to consumers. The state statute does not authorize NCG to pretend that it is the D.A., or to falsely tell check writers (whose cases have not been reviewed by actual prosecuting attorneys) that they are likely to be prosecuted if they do not "choose" to participate in the diversion program.[2]

Nonetheless, in written and telephone communications, NCG takes carefully planned steps to lead check writers to believe that they are dealing at all times directly with the district attorney's office itself.  Its form letters, sent on local district attorney letterhead, include statements such as:

> A criminal report has been filed. . . .
> **Failure to comply with payment of restitution and fees, or class attendance may subject you to criminal court proceedings.**
> (Exhibit D, 11/23/2005 letter to Lois Artz)

> **Your immediate cooperation is required to avoid potential criminal prosecution.**
> (Exhibit G, 5/27/2009 letter to Christina D. Smith).

Plaintiff Ashley Henderson has alleged that her check did not clear when Target waited three months to deposit her check, during which time she had closed her account without knowing that the Target check was outstanding. FAC ¶¶ 112, 116. Nonetheless, she was told that to avoid a court appearance on criminal charges, she had to pay $215.00 in fees and attend a class.  Exhibit N, 1/7/2009 letter to Ashley Henderson.  Despite the fact that she documented Target's delay, NCG continued to threaten her with criminal prosecution after it took over the ACCS operation. FAC ¶¶ 117-122.

**NCG's Promotion and Marketing of Its Collection Business.** NCG's claim that it merely provides administrative services to district attorneys' offices is belied by its promotions to

---

[2] To the contrary, the FDCPA prohibits the use of false representations to collect a debt, including false threats of criminal prosecution. 15 U.S.C. § 1692e(7). The Federal Trade Commission's Staff Commentary construes this prohibition to mean that that "[a] debt collector may not make a misleading statement of law, falsely implying that the consumer has committed a crime, or mischaracterize what constitutes an offense by misstating or omitting significant elements of the offense. For example, a debt collector may not tell the consumer that he has committed a crime by issuing a check that is dishonored, when the statute applies only when there is a 'scheme to defraud.'" 53 Fed. Reg. 50097-02, 50106 (1988).

1   its merchant client-base.  NCG boasts that it has high recovery rates due to the "power of the

2   district attorney's brand."  It explains to potential customers that "[t]he enforcement potential of

3   the district attorneys' office is the primary reason check writers tend to be so responsive to recovery

4   efforts." FAC ¶ 64. The coercive impact of pretending to be the district attorney and threatening to

5   prosecute and jail check writers who do not pay is the secret of NCG's success.

6       **NCG's Standardized Collection Operations.** NCG uses its own standard contracts

7   with district attorneys and has developed a series of automated, standardized communications for

8   targeted consumers, designed to deceive and frighten consumers by leading them to believe that,

9   contrary to fact, they face the real prospect of a criminal prosecution unless they pay all the fees

10  that that the enterprise demands. FAC ¶¶ 23, 35.

11      This lawsuit alleges that NCG (or ACCS) accepted payment from each named plaintiff, after

12  sending standard form letters containing three common deceptions:  (1) the communication was on

13  local district attorney letterhead, and intended to appear to be a communication directly from the

14  local district attorney; (2) the letter offered the check writer the false "choice" of either paying fees

15  and attending class, or being prosecuted; and, (3) the check writer was told that avoiding

16  prosecution was conditioned on paying fees that are not permitted by either the BCDA or by any

17  other law.  The letters that NCG sent plaintiffs are similar in form and content to those sent to the

18  class as a whole.  FAC ¶¶ 73-78, 82-146, Exhibits D-Q.

19                              **ARGUMENT**

20      Before addressing the legal issues, it is necessary to briefly confront the theme that runs

21  throughout NCG's motion—an attempt to recast this lawsuit as "in reality . . . an attack on the

22  BCDA," rather than a challenge to NCG's corporate debt-collection practices. NCG Motion at 1-2,

23  8-12, 13-15, 18-23. NCG accuses plaintiffs, for example, of "essentially seek[ing] to prevent

24  California's District Attorneys" from operating legitimate diversion programs, and of mounting "in

25  effect a challenge not only to the District Attorneys' authority, but an attack on the enactment of

26  the BCDA by the California Legislature." *Id.* at 19.

27      None of those statements is remotely accurate. In fact, this lawsuit attacks NCG's collection

28  practices alone—not the California statutory scheme authorizing legitimate diversion programs nor

the prosecutors' authority. The collection practices at issue were designed and developed by NCG's

predecessor, ACCS, and are part of a standard package that NCG markets nationally. NCG's

attempt to recharacterize this suit as a challenge to state law is especially astonishing because,

although its debt-collection operations in California are premised on the state statute, NCG's

business model in fact violates that statute in multiple respects—including demanding collection

fees well in excess of statutory limits. *See* Cal. Penal Code §§ 1001.64, 1001.64(b).

NCG's characterization of the complaint, like the legal argument in its motion, is not new.

The Eleventh Circuit rejected a similar mischaracterization in a suit against ACCS: "This action

does," the court explained, "not impede the [district attorneys'] prosecutorial decisions regarding

bad check writers—rather, it is the conduct of ACCS and the content of the communications sent

to Plaintiffs that are alleged to violate federal law. The existence of the bad check diversion program

is also not challenged." *Rosario v. American Corrective Counseling Services, Inc.*, 506 F.3d 1039, 1046-47

(11th Cir. 2007). Other than the fact that it might be less profitable to do, nothing prevents NCG

from complying with federal law. *See id.*

## I.   NCG IS A DEBT COLLECTOR COVERED BY THE FAIR DEBT COLLECTION PRACTICES ACT.

As noted above, this case does not come to the Court on a blank slate. NCG's predecessor,

ACCS, repeatedly argued in previous litigation that it was not subject to the Fair Debt Collection

Practices Act because it was engaged in "criminal law enforcement" under the state's sovereign

authority, rather than "civil debt collection." Among other things, ACCS insisted that "criminal

restitution is not 'debt' and efforts to recover such restitution are not 'debt collection'." *Del Campo v.*

*ACCS*, 491 F. Supp. 2d 891, 902-03 (N.D. Cal. 2006) (rejecting statutory argument), *aff'd*, 517 F.3d 1070

(9th Cir. 2008) (rejecting related sovereign-immunity defense).[3] The federal courts have uniformly

rejected these attempts to evade the FDCPA: An unbroken line of courts have squarely held that

---

[3] Describing ACCS's bad check collection program in California, the Ninth Circuit observed that "ACCS operated the program aggressively," that it sent demand letters "purporting to be from the DA's office," and that "ACCS has built its business around" such programs, "based upon the collection of program fees." *Del Campo*, 517 F.3d at 1072-73. The Ninth Circuit characterized ACCS's activities as "relating to debt collection rather than to law enforcement," and cited approvingly to case law "characterizing a company operating a similar bad check diversion program as a debt collector" under the FDCPA. *Id.* at 1078 n.12 (citing *Gradisher v. Check Enforcement Unit, Inc.*, 133 F.Supp.2d 988, 990 (W.D. Mich. 2001)).

1   private operators of bad-check collection programs, like NCG, are debt collectors subject to the

2   FDCPA.[4]

3       Without confronting these cases, NCG invites this Court to reach the opposite conclusion.

4   But NCG offers no persuasive reasons to justify such a radical departure from that consensus. As

5   explained below, NCG's arguments have no basis in the text of the statute enacted by Congress. "In

6   light of the Act's clear definition of 'debt,' supported by the weight of the legislative history

7   evidencing an intent that the Act be interpreted as plainly written," NCG's "policy arguments to the

8   contrary are best directed to the legislature," not the federal courts. *Bass v. Stolper, Koritzinsky, Brewster*

9   *& Neider*, 111 F.3d 1322, 1328-30 & n.13 (7th Cir. 1997) (rejecting, in the context of collection of bad

10  checks, a "judicially-created" criminal-enforcement "exception that selectively gives a green light to

11  the very abuses proscribed by the Act.").

12      **A.      Defendants are "Debt Collectors" and Were Collecting "Debt."**

13  Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt

14  collectors, to insure that those debt collectors who refrain from using abusive debt collection

15  practices are not competitively disadvantaged and to promote consistent State action to protect

16  consumers against debt collection abuses." 15 U.S.C. § 1692(e).  Consistent with those purposes, the

17  FDCPA "is an extraordinarily broad statute." *Frey v. Gangwish*, 970 F.2d 1516, 1521 (6th Cir. 1992).

18  Courts interpreting the Act are not to "ignore this fact and read an exception into the statute that is

19  nowhere to be found in its text," but instead "must enforce this statute as Congress has written it."

20  *Id.* at 521.

21      In particular, "Congress incorporated a broad definition of both 'debt' and 'debt collector'

22  into the FDCPA in order to achieve its remedial purpose." *F.T.C. v. Check Investors, Inc.*, 502 F.3d 159,

23  167 (3d Cir. 2007). The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer

24  to pay money arising out of a transaction . . .[that is] primarily for personal, family, or household

25  purposes. . . ."  15 U.S.C. § 1692a(5).  It defines "debt collector" as "any person who uses any

26  instrumentality of interstate commerce or the mails in any business the principal purpose of which

27  ────────────────

28  [4] *See, e.g., Schwarm*, 2008 WL 1970341, at *8 n.10 & n.12; *Del Campo v. ACCS, Inc.*, Civ. No. 01-21151-JW (N.D. Cal. May 8, 2002); *Gradisher*, 210 F. Supp. 2d 907 (granting summary judgment against operator of bad check program based

is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

**1. Debts Arising from Dishonored Checks Are Debt.** It is settled that a debt arising from a dishonored check is a "debt" within the meaning of the FDCPA, and that the alleged fraudulent intent of the check writer in issuing a check is irrelevant. *Charles v. Lundgren & Assocs., P.C.*, 119 F.3d 739, 742 (9th Cir. 1997). Indeed, Federal Trade Commission commentary on the FDCPA— to which courts owe considerable deference—makes clear that "debt" includes a "dishonored check that was tendered in payment for goods or services acquired or used primarily for personal, family, or household purposes." FTC, *Statements of General Policy or Interpretation: Staff Commentary On the Fair Debt Collection Practices Act*, 53 Fed. Reg. 50097-02, 50102 (1988).

The leading case on point, *Bass v. Stolper, Koritzinsky, Brewster & Neider*, 111 F.3d 1322, 1325 (7th Cir. 1997), held that dishonored checks are debt because, "[a]s long as the transaction creates an obligation to pay, a debt is created." Like NCG, the debt collector in *Bass* argued that "dishonored checks do not constitute 'debts' under the FDCPA because the tender of a worthless check is a criminal and tortuous act, not a consumer credit transaction." *Bass* held that such an exception is found nowhere in the statutory text, contradicts Congress' intent, and would encourage the very abuses the FDCPA was meant to prohibit. *Id* at 1328-30.[5]

The Third, Eighth, Ninth, Tenth, and Eleventh Circuits have all followed the Seventh in rejecting a fraudulent-intent or criminal-enforcement exception to the FDCPA in the context of dishonored checks.[6] Most recently, the Third Circuit strongly rejected a check collector's argument that writers of dishonored checks were "not entitled to the protections embodied in the FDCPA

---

on systemic FDCPA violations); *Liles v. ACCS*, 131 F. Supp. 2d at 1119; *Gradisher*, 133 F.Supp.2d at 990.

[5] In *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998), the court amplified *Bass*'s conclusion in unequivocal terms: "[N]either the text nor the underlying legislative history of the FDCPA lends itself to the recognition of a fraud exception. Indeed, *nothing* in the Act makes inquiry into the debtor's intent at the time he or she writes a subsequently dishonored check. Its language focuses primarily, if not exclusively, on the conduct of debt collectors, not debtors. Absent some textual directive in the FDCPA, we will not alter that focus, for our task is to interpret the words of Congress, not to add to them."

[6] *Charles v. Lundgren & Assoc.*, 119 F.3d 739, 742 (9th Cir. 1997) (adopting "cogent analysis" in *Bass*); *Brown v. Budget Rent-A-Car Systems, Inc.*, 119 F.3d 922, 924 (11th Cir. 1997) ("the payment obligation which arose from a dishonored check constitutes a debt as defined in the Act"); *see also Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367 (11th Cir. 1998) ("[B]ounced checks represent legal obligations to pay."); *Duffy v. Landberg*, 133 F.3d 1120, 1124 (8th Cir. 1998) (rejecting

---

because they are criminals" rather than consumers. *Check Investors, Inc.*, 502 F.3d at 169; *accord Gradisher*, 133 F. Supp. 2d at 991 ("This rule holds even when consumers write checks knowing they will be dishonored."). The Third Circuit emphasized, as did the Seventh, that most consumers who bounce checks lack criminal intent—"for example, when the drawer makes a simple miscalculation or has a subsequent emergency need for funds"—but held that "even if some of the payors of NSF checks *had* engaged in fraud at the time of the transaction," that would make no difference under the FDCPA because the court cannot create an exception for such conduct "without amending the statute." *Id.* at 170-71. There is, in other words, no fraud or criminal-enforcement exception to the FDCPA.

**2. "Check Restitution" Is Debt Collection.** NCG also conspicuously avoids the growing body of cases addressing the "check restitution" business. In an action in California against NCG's *de facto* predecessor, ACCS, the court rejected ACCS's arguments that it was not covered by the FDCPA, ruling that "[t]he Court finds that ACCS is a private actor attempting to take action to collect a debt against private individuals in order to compensate third party creditors, and thus, is bound by the requirements of the FDCPA." *Del Campo v. ACCS, Inc.*, 491 F. Supp. 2d 891, 902-03 (N.D. Cal. 2006). The court also rejected ACCS's theory that "criminal restitution is not 'debt' and efforts to recover such restitution are not 'debt collection'" because, as discussed above, that theory cannot be reconciled with the "broadly worded provisions of the FDCPA" defining "debt" and "debt collector." *Id.*

Every other court to confront the question of whether check collection program operated under contract with prosecutors is covered by the FDCPA has reached the same result. In *Schwarm v. Craighead*, 552 F.Supp.2d 1056 (E.D. Cal. 2008), in an action against a different company operating a check restitution business pursuant to contracts with California district attorneys, the court ruled that a "dishonored check is a 'debt'" and "the FDCPA does not distinguish whether a debt collection business is operated pursuant to criminal or civil law." *Id.* at 1070 n.10 & n.12. Similarly, in *Gradisher*, the court rejected an attempt by Check Enforcement Unit, Inc. (CEU) to escape the FDPCA on the

---

the argument that, because "liability arising from a dishonored check" was "based on . . . criminal law," it did not "arise from a transaction within the meaning of the FDCPA.").; *Snow v. Jesse L. Riddle, P.C.*, 143 F.3d 1350 (10th Cir. 1998).

1   grounds that "the focus of CEU's activity is not collection of a debt, since CEU does not pursue civil

2   contractual obligations but, rather, criminal law enforcement." 133 F.Supp.2d at 990. Despite its

3   invocation of criminal law and its government contract, CEU was seeking to collect on the

4   underlying obligation: "Whether one calls CEU's efforts 'recovery' or 'collection' makes no

5   difference—CEU engaged in the collection of checks which had been paid to merchants and had not

6   cleared the check writer's bank and, if this amount was recovered, forwarded it to the merchant." *Id.*;

7   *see also Liles v. ACCS, Inc.*, 131 F. Supp. 2d 1114, 1119 (S.D. Iowa 2001) ("ACCS is a private contractor" and

8   "there is no private contractor exception to the definition of debt collector in the FDCPA"); *Brannan v.*

9   *United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996) (FDCPA does not exempt private

10   government contractors engaged in debt collection activities).

11        The same is true here: Whether one calls NCG's efforts "restitution" or "collection" (or

12   anything else) makes no difference—NCG collects debts for local merchants, which it distributes to

13   the merchant, the district attorney and to itself. Indeed, NCG openly markets itself to merchants to

14   increase its collections business, operates in competition with other collection firms, only makes

15   money when it collects on checks, and uses bonuses and commissions to incentivize its employees to

16   increase collections. Although NCG collects with the permission of local district attorneys, the check

17   writers from whom it collects have not been charged with any crime, and the money NCG collects is

18   not a court-imposed fine. It is merely an amount that a district attorney and NCG have agreed that

19   NCG may charge check writers from whom it is attempting to collect money. Labeling the money

20   collected as "criminal restitution" rather than "debt" does not remove NCG from FDCPA coverage.

21   Plaintiffs allegations that NCG carries on this debt collection on a regular basis, see e.g., FAC 3, 20,

22   22, 23, 35, 59, 64, 65, 66, 72, 73 is sufficient to establish that NCG "regularly collects or attempts to

23   collect" debt, and is therefore a "debt collector," covered by the FDCPA.

24        **B.    The FDCPA and the BCDA Are Not Incompatible and, In Any Event, the**
        **Supremacy Clause Does Not Permit Debt Collectors to Ignore Federal**
25        **Law.**

26        Without bothering to cite any cases interpreting the FDCPA on this point, NCG makes a

27   policy argument as to why it believes the FDCPA is incompatible with the BCDA. There is no

28   incompatibility. If NCG, as a private entity under contract with a district attorney, disclosed its

1   identity, did not make false prosecution threats, did not charge unlawful fees, and included the

2   minimal verification and disclosure warnings required by the FDCPA, there would be no FDCPA

3   violations.  Instead, NCG exploits its relationship to the district attorney to generate unlawfully

4   coercive and deceptive communications, threatening to prosecute check writers who do not pay fees

5   far in excess of what is permitted by law.

6           The FDCPA simply requires that debt collectors tell the truth and not try to collect more than

7   is owed. Thus, NCG may not seek to collect fees in excess of those permitted by law, or masquerade

8   as the prosecutor to enhance the coercive impact of its collection demands. 15 U.S.C. §§ 1692(f)(1),

9   e(10), e(14).  Nothing in California law would block NCG from asking only for payments that are

10  lawfully due and honestly stating that it is a private company hired by the district attorney.  Nor is

11  there any inconsistency with respect to notice requirements. The FDCPA requires disclosure that a

12  communication is from a debt collector and gives a consumer thirty days from an initial

13  communication to request verification of the debt, 15 U.S.C. §§ 1692e(11), 1692g(a), while the

14  California statute lists four items that must be included in the initial communication: the date and

15  amount of the check, the payee's name, the date by which the consumer must respond, and a

16  statement of the penalty for the offense. Cal. Penal Code § 1001.63. There is no reason why NCG

17  could not comply with both state and federal law by including in its initial communications both the

18  notice required by the FDCPA and the notice required by the California statute.

19          In any event, under the Supremacy Clause, any inconsistency between state and federal law

20  could only mean one thing: that state law must give way.  NCG's argument to the contrary appears to

21  rest on the false premise that county officials may give permission to a debt collector to ignore the

22  FDCPA.  In effect, defendants concede that their practices violate the FDCPA and argue that it is *this*

23  *very illegality* that provides the basis for them to escape scrutiny under federal law. Under both the

24  Supremacy Clause and the FDPCA, federal law prevails over inconsistent state laws or local

25  regulations. *See* 15 U.S.C. § 1692n.[7]

26  _____

27      7 . Title 15 U.S.C. § 1692n, provides:
        This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this
28      subchapter from complying with the laws of any State with respect to debt collection practices, except to
        the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent

### C.   The 2006 Amendment to the FDCPA Makes Clear That Private Companies Like NCG Are Debt Collectors and Are, Absent the Satisfaction of Stringent Conditions, Subject to the FDCPA.

In 2006, Congress enacted an amendment to the FDCPA that made clear that bad-check-diversion programs operated under contract with district attorneys remain subject to the full range of the Act's provisions unless they are able to meet certain specific conditions designed to protect consumers from overreaching by private contractors. 15 U.S.C. § 1692p. Through this amendment, Congress closed the door on the argument that, prior to the amendment, "check restitution" companies were not debt collectors. *Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1069 (E.D. Cal. 2008) (holding that Section 1692p is not retroactive). The amendment's default rule—that check collectors remain covered by the FDCPA—confirms the consistent holdings of federal appellate courts that there is no fraud or crime exception to the FDCPA and that Congress intended that debts arising from checks be debts covered by the FDCPA regardless of the check-writer's intent.

At the same time, Congress carved out a conditional exemption from the Act for diversion programs that comply with a set of stringent protections. Although NCG contends that it is exempt from the Act by virtue of Section 1692p, it avoids addressing *any* of the specific conditions set forth in that provision. For that reason alone, NCG's invocation of Section 1692p fails. Furthermore, plaintiffs' factual allegations are more than sufficient to show that NCG cannot meet the Section 1692p prerequisites, particularly at the motion-to-dismiss stage of the proceedings.  For example:

**1.  Lack of Compliance With State Penal Law.** Contrary to 15 U.S.C. § 1692p(a)(2)(C)(i), NCG does not comply with the penal laws of the state, *i.e.*, the BCDA. NCG charges a class fee and other fees that are not authorized by the BCDA or any other statute. FAC ¶¶ 1, 44, 45, 54, 80, 86, 102, 115, 130, 138, 177(b).  Further, although the BCDA requires a probable cause assessment and referral by the district attorney, Cal. Penal Code §§ 1001.60, 1001.62, merchants refer checks directly to NCG, without any individualized review by the district attorney. FAC ¶¶ 50-52, 59-62, 66, 70, 71, 75, 97, 104, 124, 135, 145, 177(d), (e), 186.

---

of the inconsistency.  For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

**2. Lack of District-Attorney Probable-Cause Determinations.** Contrary to 15 U.S.C. § 1692p(a)(2)(C)(iv), NCG collects checks without any probable-cause or appropriateness determination by a district attorney. The blanket "probable cause" determination for all checks that have allegedly not been paid within ten days of the merchant providing "reasonable notice" (FAC, ¶ 52, "Intake Criteria," Exhibit B at 10) does not meet the exemption's requirements that a district attorney actually determine probable cause, and, in any case, NCG does not require a creditor to provide proof that the alleged offender has failed to pay the dishonored check after demand for payment. FAC ¶¶ 50-52, 59-62, 66, 70, 71, 75, 97, 104, 124, 135, 145, 177(d), (e), 186.

**3. Lack of District Attorney Direction, Supervision, and Control.** Plaintiffs allege that the NCG/ACCS program is not operated under the direction, supervision and control of the respective district attorney offices, as required by 15 U.S.C. § 1692p(a)(2)(B).

**4. Inadequate Consumer-Dispute Procedures.** NCG's initial communications to consumers fail to provide a real opportunity for consumers to initiate a dispute with the respective district attorney offices themselves and to obtain an actual probable-cause determination by the district attorney, in violation of 15 U.S.C. § 1692p(a)(2)(C)(v).

**5. Lack of Conformity With Written Agreements.** NCG also fails to conform to the terms of the written agreements, including, for example, (i) its application of the standard collection activity to check writers whose checks do not meet the agreed-upon "prosecution review criteria," (ii) its failure to refer consumer disputes to the respective district attorney offices, and (iii) its failure to require merchants to demonstrate written notice to the check writer, all required by 15 U.S.C. § 1692p(a)(2)(C)(ii). FAC ¶ 177. In sum, plaintiffs' factual allegations are sufficient to show that NCG does not meet the requirements set forth in 15 U.S.C. § 1692p, and is therefore fully covered by the FDCPA.

## II. NCG IS NOT ENTITLED TO QUALIFIED IMMUNITY.

NCG next argues that it should be able to avoid suit altogether under the doctrine of qualified immunity. Although it is a private corporation, NCG argues that it enjoys immunity because it is "performing a government function." NCG Motion at 16. That argument, however, overlooks a body of recent Supreme Court and the Ninth Circuit precedent making clear that

qualified immunity is unavailable to private contractors on the theory that they are performing arguably governmental functions. As the Ninth Circuit explained in a case rejecting an absolute immunity defense raised by NCG's predecessor:

> [I]n the qualified immunity context, the Supreme Court has warned that 'a purely functional approach [to the private entity immunity inquiry] bristles with difficulty,' because 'government and private industry may engage in fundamentally similar activities,' even though private entities are not entitled to immunity.

*Del Campo v. Kennedy*, 517 F.3d 1070, 1080 (9th Cir. 2008) (quoting *Richardson v. McKnight*, 521 U.S. 399, 409 (1997)).

In *Richardson*, the case on which *Del Campo* relied, the Supreme Court declined to extend qualified immunity to prison guards employed by a private corporation managing a prison under contract with a state. *Richardson*—the only Supreme Court decision addressing the interaction between privatization and qualified immunity—"answered the immunity question" in the context "in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Id.* at 413. Observing that, "in many areas, government and private industry may engage in fundamentally similar activities," *Richardson* rejected a "functional approach" to analyzing claims of qualified immunity by private entities. *Id.* at 409. The Court explained that it "never has held that the mere performance of a governmental function could make the difference" between liability and immunity, "especially for a private person who performs a job without government supervision or direction." *Id.* at 408-09. Instead, the Court stressed "certain important differences that, from an immunity perspective, are critical," including the "ordinary marketplace pressures" that are present when a "firm is systematically organized to perform a major administrative task for profit." *Id.* at 409. The Court concluded that private guards "resemble those of other private firms and differ from government employees," and therefore should not be entitled to qualified immunity. *Id.* at 410.

*Richardson* thus strongly reaffirmed the Court's earlier recognition that qualified immunity's rationales are "not transferable to private parties." *Wyatt v. Cole*, 504 U.S. 158, 168 (1992) (private

parties collecting debt under replevin statute not entitled to qualified immunity). The Court also placed a renewed emphasis on the profit motive—a consideration with special significance for debt collection. As Congress observed when it enacted the FDCPA, independent debt collectors, unlike most businesses, are not "restrained by the desire to protect their good will" or "the consumer's opinion of them." S. Rep. 95-382, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696 (1977). Rather, "collection agencies generally operate on a 50-percent commission, and this has too often created the incentive to collect by any means." *Id.* As 21 States recently explained to the Supreme Court: "Debt collectors are not at all like public officers, who are entitled to qualified immunity when the law is unclear. The policies that animate qualified immunity do not apply to the conduct of private profit-seeking parties."[8]

Since *Richardson*, the Ninth Circuit has consistently rejected qualified-immunity defenses raised by private entities and individuals in a range of settings:

- *Ace Beverage Co. v. Lockheed Info. Mgmt. Servs.*, 144 F.3d 1218, 1219 (9th Cir. 1998) (private government contractor that collected parking ticket fines was not entitled to immunity because it was "a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government," "for profit and potentially in competition with other firms") (quoting *Richardson*, 521 U.S. at 413).

- *Halvorsen v. Baird*, 146 F.3d 680, 685-86 (9th Cir. 1998) (private, non-profit corporation that operated a detoxification facility under government contract was "a firm systematically organized to assume a major lengthy administrative task" and therefore was not entitled to immunity).

- *Bibeau v. Pacific Northwest Research Found. Inc.*, 188 F.3d 1105, 1111-12 (9th Cir. 1999) (private research foundation that conducted radiation experiments on inmates at Oregon State Penitentiary was not entitled to immunity; the Court found "no principled distinction between [the research foundation], the private prison guards involved in *Richardson* and the private detoxification facility in *Halvorsen*").

- *Jensen v. Lane County*, 222 F.3d 570, 576 (9th Cir. 2000) (immunity was "categorically unavailable" to a private contract psychiatrist who signed an involuntary commitment order).

- *Gonzalez v. Spencer*, 336 F.3d 832, 834-35 (9th Cir. 2003) (private attorney hired by state entities, whose role "was analogous to that of a state prosecutor," was a "private party, not a government employee" and could demonstrate "'no special reasons significantly favoring an

---

[8] Brief of the States of New York, et al. as *Amici Curiae* in Support of Petitioner in No. 08-1200, *Jerman v. Carlisle* (filed Sept. 28, 2009), 2009 WL 3143708, at 6.

1    extension of governmental immunity' to private parties in her position.'") (quoting

2    *Richardson*, 521 U.S. at 412).

3    In short, under Ninth Circuit precedent, private, for-profit contractors like NCG are not entitled to

4    qualified immunity by virtue of their contracts with government agencies.

5    In the face of this overwhelming authority, NCG relies on just one case, *Bradley v. Medical Bd.*,

6    56 Cal. App. 4th 445 (Cal. App. 4th Dist. 1997), a state-court decision concerning federal qualified

7    immunity doctrine that cannot be reconciled with *Richardson* or Ninth Circuit precedent. *Bradley*

8    itself acknowledged that "the Ninth Circuit . . . has consistently held private defendants are not

9    entitled to qualified immunity," but simply disagreed. *Id.* at 462 n.14 ("While we commonly follow

10   Ninth Circuit opinions as persuasive authority, in this instance we respectfully disagree with the

11   court's apparent blanket position that qualified immunity does not shield private defendants from

12   section 1983 liability.").[9]

13   Even apart from its failure to grapple with relevant Supreme Court and Ninth Circuit

14   precedent, NCG's motion rests on a series of unexamined and questionable assumptions. For

15   example, NCG assumes that, if a functional analysis of the kind rejected in *Richardson* were

16   appropriate, its debt-collection activities would constitute a governmental function. But the Ninth

17   Circuit has suggested just the opposite. In discussing NCG's predecessor, the Ninth Circuit found

18   it "questionable" that "its activities—which appear to be primarily administrative and relating to

19   debt collection rather than to law enforcement—constitute a central government function." 517

20   F.3d 1070 at 1079 n.12 (citing *Gradisher*, 133 F.Supp.2d at 990).[10]  NCG's immunity argument also

21   casually assumes that "there is no dispute that the District Attorneys [would be] immune from

22   liability for the actions complained of." Motion at 18. *But see Del Campo*, 491 F. Supp. 2d at 900

23

24       [9] As noted, *Bradley* concerns the *federal* qualified-immunity doctrine. "There is no comparable qualified immunity under California law." *Venegas v. County of Los Angeles*, 153 Cal.App.4th 1230, 1249 (Cal. App. 2d Dist. 2007).

25       [10] *See In re Reisen*, 2004 WL 764628, at *2-*5 (Bkrtcy. N.D. Iowa 2004) ("The Restitution Program exists to facilitate the payment of bad checks. It operates under typical debt collection rules [and its] function is more similar to private debt collection than a typical government function."); *In re Simonini*, 272 B.R. 604, 614-18 (Bankr. W.D.N.C.

26   2002) ("The [Clark County District Attorney's Bad Check Diversion Unit's] prosecution is debt collection in sheep's clothing."); *In re Baumblit*, 15 Fed. Appx. 30, 36 (2d Cir. 2001) (District Attorney's Bad Check Unit "administers a

27   program that attempts to collect payment of bad checks through the threat of prosecution. . . . The mere fact that the BCU is a collection program associated with a local district attorneys' office does not make its actions a criminal

28   proceeding.").

1  ("[T]he District Attorney's decisions to contract with ACCS . . . have no connection to the District

2  Attorney's role as a prosecutor . . . As such, he is not entitled to absolute immunity for acting in his

3  prosecutorial capacity as a state actor."). And NCG makes no attempt whatsoever to show that

4  "their conduct did not violate clearly established statutory or constitutional rights of which a

5  reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)—a dubious

6  proposition in light of decisions squarely holding that indistinguishable conduct by check

7  restitution companies was illegal. *See, e.g., Schwarm*, 2008 WL 1970341, at *11-19; *Gradisher*, 210 F.

8  Supp. 2d at 912-19; *see also Irwin v. Mascott*, 112 F. Supp. 2d 937, 952 (N.D. Cal. 1999).

9        Finally, there are special reasons for rejecting an attempt to import the federal common-law

10  doctrine of qualified immunity—which is normally reserved for constitutional litigation—into a

11  suit over statutory FDCPA violations. The FDCPA's bona-fide error defense, 15 U.S.C. § 1692k(c),

12  already "offers a kind of qualified immunity to debt collectors, protecting actions which otherwise

13  are covered by the statute but arose from bona fide error and were not intentional violations."

14  *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 232 (4th Cir. 2007). To be eligible for that limited

15  defense, however, debt collectors must show that their actions occurred despite the "maintenance

16  of procedures" designed to protect consumers and avoid violations of the Act. *Id.* "Such a provision,"

17  the Fourth Circuit has pointed out, "supplies an additional argument against implying immunities

18  as to which the statute is silent: Congress addressed the issue of immunity expressly and extended

19  it only as far as § 1692k(c) provides. To insist that some unarticulated, common law immunity

20  survived the creation of the FDCPA would be to fail to give effect to the scope of the immunity

21  articulated in the text." *Id.* at 232.

22  **III.   ABSTENTION IS UNWARRANTED.**

23        If it cannot have immunity, NCG asks the Court to dismiss this entire case based on a vague

24  appeal to abstention principles. Once again, however, NCG's motion revisits arguments that were

25  rejected in the ACCS litigation. *See* Order Denying Motion Based on Abstention in *Del Campo v.*

26  *Mealing*, Civ. No. 01-21151 JW (N.D. Cal. July 7, 2006) (Exhibit 1) (rejecting *Burford* abstention);

27  *Hamilton v. ACCS*, 2006 WL 3332828, at *2-4 (N.D. Ind. 2006) (rejecting a grab-bag of abstention

28

1   theories, including *Younger* abstention, general considerations of comity and federalism, and alleged

2   interference with state police powers).

3          "Because the federal courts' obligation to adjudicate claims within their jurisdiction is

4   virtually unflagging, abstention is permissible only in a few carefully defined situations with set

5   requirements." *United States v. Morros*, 268 F.3d 695, 703 (9th Cir. 2001). NCG's motion fails entirely

6   to address those "carefully defined situations" or meet those "set requirements." Instead, the motion

7   consists chiefly of sweeping generalities about federalism and comity. As explained below, the only

8   abstention doctrine NCG mentions by name—*Burford* abstention—is plainly inapposite.[11]

9          "*Burford* represents an extraordinary and narrow exception to the duty of the District Court

10  to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727-28

11  (1996). The rarely-invoked doctrine, also known as "administrative abstention," gets its name from

12  *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), a case in which the Supreme Court refused to hear a suit

13  "attack[ing] the validity of an order of the Texas Railroad Commission granting the petitioner

14  Burford a permit to drill four wells on a small plot of land in the East Texas oil field." *Id.* at 317. In

15  concluding that abstention was appropriate, the Court emphasized the complexity of Texas's state

16  administrative processes, the need for centralized decision making in allocating oil-drilling rights,

17  and Texas's centralized mechanism for judicial-review of permit decisions in the state courts. *Id.* at

18  318. A single agency and a single state court were best equipped to deal with these "thorny" issues

19  because, "since oil moves through the entire field, one operator can not only draw the oil from under

20  his own surface area, but can also, if he is advantageously located, drain the oil from the most

21  distant parts of the reservoir." *Id.* at 318-19.

22

23

24

25

26       [11] Although NCG does not expressly invoke *Younger* abstention, its motion repeatedly cites *Younger v. Harris*, 401
         U.S. 37 (1971). *See* NCG Motion at 18, 20. *Younger* abstention applies only to "pending state court proceedings," *id.* at 41,
27       and no state-court proceedings are pending against the plaintiffs here. *See Ankenbrandt v. Richards*, 504 U.S. 689, 705
         (1992) ("Absent any pending proceedings in state tribunals, therefore, the application by the lower courts of *Younger*
28       abstention was clearly erroneous."); *Hamilton*, 2006 WL 3332828, at *2 (rejecting *Younger* abstention on this basis).

In the sixty-three years since *Burford*, the Supreme Court has found abstention under *Burford* to be appropriate only once, in 1951, in a case by a railroad challenging an administrative order of the Alabama Public Service Commission concerning local train service. *See Ala. Pub. Serv. Comm'n v. Southern Ry.*, 341 U.S. 341 (1951). In every case since 1951 in which a party has raised *Burford* abstention, the Court has rejected it as unwarranted and has taken pains to rein in the doctrine.

Given the paucity of Supreme Court decisions defining the parameters of *Burford* abstention, the "doctrine has received its real shape" in the lower courts. Young, *Federal Court Abstention and State Administrative Law from* Burford *to* Ankenbrandt: *Fifty Years of Judicial Federalism under* Burford v. Sun Oil Co. *and Kindred Doctrines*, 42 DePaul L. Rev. 859, 898 (1993). The "Ninth Circuit," in particular, "narrowly limits the doctrine to cases closely resembling the facts of the original *Burford* case." *Id.* at 900; *see Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 377 (9th Cir. 1982) ("This circuit has been careful to avoid extending *Burford*.").

"In an effort to limit the application of abstention under the *Burford* principle," *Tucker v. First Md. Sav. & Loan, Inc.*, 942 F.2d 1401, 1405 (9th Cir. 1991), "the Ninth Circuit requires the presence of certain factors before a district court can abstain under *Burford*." *City of Tucson*, 284 F.3d at 1133. Those three factors can be summarized as follows:

- "first, that the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court;"

- "second, that the federal issues could not be separated easily from the complex state law issues with respect to which state courts might have special competence;" and

- "third, that federal review might disrupt state efforts to establish a coherent policy."

*Id.* Abstention where any of these factors are lacking is error. *Id.* All three are absent here.

## A. This Suit Would Not Displace Review of a State Administrative Agency by a Particular State Court with Specialized Expertise.

First, *Burford* abstention is limited to suits in which a federal court has been asked to review "the proceedings or orders of state administrative agencies." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989). Because NCG has not cited any state administrative agency process, complex or otherwise, arguably at issue here, *Burford* is plainly inapposite. *Fragoso v. Lopez*,

1   991 F.2d 878, 882-83 (1st Cir. 1993) (*Burford* is not "at all relevant" where the action does not seek

2   review of action by a "state administrative agency"); *Nucor Corp. v. Neb. Pub. Power Dist.*, 891 F.2d 1343,

3   1348 (8th Cir. 1989) (*Burford* abstention is inappropriate where "the challenges are not directed at

4   the decisions of an independent regulatory commission, nor is there a centralized state judicial

5   review scheme in place").

6           But even assuming counterfactually that this lawsuit were seeking review of a complex state

7   administrative process with an established avenue for state-court judicial review, abstention would

8   still be improper because the case does not meet the Ninth Circuit's first criterion for *Burford*

9   abstention: Unlike the Texas oil-drilling scheme in *Burford*, California has not established a

10  mechanism through which consumers can challenge fee assessments by bad check diversion

11  programs in a court with specialized expertise in such matters. Because one of the central

12  rationales of *Burford* was the need to avoid disruption of the uniform regulation of oil-drilling by

13  specialized state administrators and judges, the Ninth Circuit has consistently held that *Burford* is

14  implicated only where "the state has chosen to concentrate suits challenging the actions of the

15  agency involved in a particular court." *City of Tucson*, 284 F.3d at 1113.[12]

16  **B. This Suit Does Not Primarily Involve State Law, and the State-Law Issues**
    **Presented Are Unexceptional.**

17

18          Second, *Burford* abstention is appropriate only "where the issues sought to be adjudicated in

19  federal court are primarily questions regarding that state's laws." *Tucker*, 942 F.2d at 1407. As in

20  *Tucker*, "[t]his simply is not the situation before us," and therefore, "abstention under the principles

21  set forth in *Burford* [is] not appropriate in this case." *Id.* The central issues in this case concern

22  whether the defendants' debt-collection practices run afoul of RICO and the FDCPA. Plaintiffs

23

24  --------------------------------------------------

    [12] *See also Kirkbride v. Continental Cas. Co.*, 933 F.2d 729, 734 (9th Cir. 1991) ("The fact that California has not

25  established a specialized court system to resolve disputes over insurance policy coverage convinces us that application
    of the *Burford* doctrine to this case is unwarranted."); *Almodovar v. Reiner*, 832 F.2d 1138, 1141 (9th Cir. 1987) (*Burford*

26  abstention was improper where "California has not established a specialized court system"); *Knudsen*, 676 F.2d at 377
    (*Burford* abstention was improper where "Nevada has not concentrated challenges to the regulations in any particular or

27  specialized court"); *Int'l Bhd. of Elec. Workers v. Public Serv. Comm'n*, 614 F.2d 206, 211 (9th Cir. 1980) (*Burford* abstention was
    improper where "Nevada has not concentrated challenges to the Commission's regulatory orders in any particular or

28  specialized court; such suits may arise in any state district court").

1   have also pleaded supplemental state-law causes of action, but NCG has not suggested that those

2   claims are the primary questions in the case or that they are especially complex.

3   　　　　　Even setting aside the overwhelming federal-law nature of this suit, defendants' motion fails

4   because it does not meet the Ninth Circuit's second basic criterion for *Burford* abstention—that the

5   federal issues cannot be separated from "complex state law issues with respect to which state

6   courts might have special competence." *City of Tucson*, 284 F.3d at 1133.  Although the presence of

7   such complex state-law issues is the *sine qua non* of *Burford* abstention, NCG does makes little effort

8   to identify any sufficiently complex issues. They assert only that this case may require to decide

9   "complex State law issues such as whether or not the diversion program is operating in compliance

10   with its authorizing Penal Code and whether or not the District Attorney is exercising sufficient

11   control over the BDCP." NCG Motion at 22. But NCG provides no explanation as to why these

12   issues should be considered "complex" or why the state courts would have "special competence" to

13   decide them.[13]

14   **C. This Suit Would Not Disrupt State Efforts to Establish a Coherent Policy.**

15   　　　　　Third, the question whether NCG's operations comply with the California Penal Code fails

16   to satisfy the Ninth Circuit's third criterion for *Burford* abstention—"that federal review might

17   disrupt state efforts to establish a coherent policy." *City of Tucson*, 284 F.3d at 1133.  To the contrary,

18   to the extent the Court must decide it, this question concerns whether the design and

19   implementation of the challenged program *deviates from* the statewide policy adopted by the

20   California Legislature and embodied in the bad check diversion statute.  The issue, in other words,

21   is whether the challenged program is *inconsistent* with the state's "efforts to establish a coherent

22   policy."  As in *City of Tucson*, this suit "does not attack [California's bad check diversion] policy" as a

23   general matter, but instead, presents a challenge to defendants' specific practices, a challenge that

24

25   　　　[13] In a previous lawsuit challenging a debt collector's operation of a bad check diversion program in California, the court rejected a request to decline to exercise jurisdiction on the grounds that the suit presented "complex" state-

26   law issues and implicated comity and federalism concerns: "The court here faces a single, unexceptional question of statutory interpretation: whether [the debt collector defendant] had statutory authorization under California law to

27   seek fees from putative plaintiffs beyond the actual amount of bank charges incurred." *Schwarm v. Craighead*, 233 F.R.D. 655, 659 (E.D. Cal. March 7, 2006). NCG's supposedly "complex" state-law issue is that same "single, unexceptional question of statutory interpretation." *Id*

28

1  "can be decided by a federal district court" based on the facts and circumstances of the case. *Id.* at

2  1134.

3        At bottom, the thrust of NCG's motion is that this Court should abstain from scrutinizing

4  NCG's practices under federal law because doing so would "interfere" with a program operated

5  under state law. NCG Motion at 18-23. As we have already explained above (at 5-6, 10-11), this case

6  implicates no inconsistency between state and federal law. And not surprisingly, nothing in

7  Supreme Court or Ninth Circuit jurisprudence supports the wild notion that such inconsistency is

8  an appropriate basis for abstention under *Burford*.  Quite the opposite. The Ninth Circuit has

9  repeatedly declared that *Burford* abstention is "particularly inappropriate" where preemption by a

10  federal statute may be at issue, "because abstaining under *Burford* would be an implicit ruling on the

11  merits." *Morros*, 268 F.3d at 705; *see also New Orleans Pub. Serv.*, 491 U.S. at 362-63 ("[F]ederal

12  adjudication of this sort of pre-emption claim would not disrupt the state's attempt to ensure

13  uniformity in the treatment of an essentially local problem.").  As then-Judge Kennedy explained,

14  where preemption is potentially at issue, *Burford* "cannot be appropriate" because the question is

15  whether "Congress has determined that particular matters are of national concern and should be

16  administered by national, rather than local, institutions." *Int'l Bhd. of Elec. Workers*, 614 F.2d at 212 n.1.

17  Thus, to the extent that the FDCPA imposes any obligations on debt collectors that are

18  inconsistent with those imposed by California law, as NCG suggests, abstention under *Burford*

19  abstention would be especially unwarranted.

20  **D.  Dismissal On Abstention Grounds Is Impermissible In a Damages Suit.**

21        Finally, the NCG's motion should be denied because "federal courts have the power to

22  dismiss or remand cases based on abstention principles" only where the relief sought is "equitable

23  or otherwise discretionary," and may not do so where damages are sought. *Quackenbush.*, 517 U.S. at

24  731. *Quackenbush*'s holding has been described as "an ironclad, *per se* bar" to the dismissal of damages

25  actions that "left no exceptions." *Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 702 (5th Cir. 1999). As

26  in *Quackenbush*, this suit seeks damages. "If the elements . . . are satisfied, the district court would

27  have no discretion to deny relief to the [plaintiffs] on their legal claim[s]" under the FDCPA. *Gross v.*

28

1  *Weingarten*, 217 F.3d 208, 223 (4th Cir. 2000); *see* 15 U.S.C. § 1692k(a). Accordingly, under

2  *Quackenbush*, this Court lacks the power to dismiss this action under *Burford*.

### CONCLUSION

4      National Corrective Group's motion to dismiss should be denied in its entirety.

5  DATED: April 16, 2010                                    Respectfully submitted,

6                                                           */s/ Paul Arons*

8  Irv Ackelsberg (*pro hac vice*)                          Paul Arons, State Bar #84970
   John J. Grogan (*pro hac vice*)                          LAW OFFICE OF PAUL ARONS
9  LANGER GROGAN & DIVER, P.C.                              685 Spring Street, #104
   1717 Arch Street, Suite 4130                             Friday Harbor, WA 98250
10 Philadelphia, PA 19103                                   Tel: (360) 378-6496
   Tel: (215) 320-5660                                      Fax: (360) 378-6498
11 Fax: (215) 320-5703                                      lopa@rockisland.com
   iackelsberg@langergrogan.com
12

13 Ronald Wilcox (State Bar #176601)                        Deepak Gupta (*pro hac vice*)
   2160 The Alameda, 1st Floor, Suite F                     PUBLIC CITIZEN LITIGATION GROUP
14 San Jose, CA 95126                                       1600 20th Street, NW
   Tel. (408) 296-0400                                      Washington, DC 20009
15 Fax: (408) 296-0486                                      Tel.: (202) 588-1000
   ronaldwilcox@post.harvard.edu                            Fax: (202) 588-7739
16                                                          dgupta@citizen.org

17                                                          *Attorneys for Plaintiffs*