Deepak Gupta (*pro hac vice*)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Tel.: (202) 588-1000
Fax: (202) 588-7739
dgupta@citizen.org

Irv Ackelsberg (pro hac vice)
John J. Grogan (pro hac vice)
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel.:  (215) 320-5660
Fax: (215) 320-5703
iackelsberg@langergrogan.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA SMITH, et al.<br><br>Plaintiffs,<br>v.<br><br>LEVINE LEICHTMAN CAPITAL PARTNERS, INC., et al.<br><br>Defendants. | Civ. No. 3:10-cv-0010 JSW<br><br>CLASS ACTION<br><br>DECLARATION OF DEEPAK GUPTA IN OPPOSITION TO NATIONAL CORRECTIVE GROUP, INC's SPECIAL MOTION TO STRIKE COUNTS III, IV AND VI OF THE FIRST AMENDED COMPLAINT<br>[Docket No. 37] |

I, Deepak Gupta, declare as follows:

1. I am Staff Attorney and Director of the Consumer Justice Project at Public Citizen Litigation Group, the litigating arm of the national, non-profit organization Public Citizen in Washington, D.C. I also serve as Adjunct Professor of Law at both American University, where I teach Appellate Advocacy, and Georgetown University Law Center, where I teach Public Interest Advocacy.

2. I am making this declaration in support of plaintiffs' opposition to National Corrective Group's special motion to strike under the California anti-SLAPP statute. The purpose of this declaration is to provide some factual support to our contention that this is an action brought in the public interest. Specifically, this declaration provides background information concerning Public Citizen's role—both through litigation and public policy advocacy—in the ongoing effort to end abusive and deceptive collection practices on the part of NCG and its predecessor, American Corrective Counseling Services (ACCS).

3. Public Citizen was founded by Ralph Nader in 1971. For nearly 40 years, Public Citizen has served as a voice for consumers in the nation's capital. The organization includes five policy groups: the Congress Watch division, the Energy Program, Global Trade Watch, the Health Research Group, and the Litigation Group. All of the groups advocate for consumers' rights and corporate and governmental accountability.

4. The Litigation Group, founded in 1972 by Alan Morrison, specializes in cases involving health and safety regulation, consumers' rights, separation of powers, access to the courts, class actions, open government, and the First Amendment. We litigate at all levels of the federal and state judiciaries and are particularly known for our appellate litigation and active practice before the Supreme Court of the United States. We operate a Supreme Court Assistance Project, which has assisted lawyers in hundreds of public-interest cases before the Supreme Court over the past twenty years. (Before becoming director of the Consumer Justice Project, I worked as coordinator of that project. In my current role, I continue to work on public-interest cases in the Supreme Court at both the

cert-stage and merits-stage; I focus particularly on cases with the potential to broadly affect consumer rights.).

### Public Citizen's Initial Decision to Take Action Against ACCS/NCG

5. In 2005, Public Citizen launched the Consumer Justice Project within the Litigation Group, with the aim of collaborating with private consumer lawyers and other public-interest organizations nationwide on class actions, appeals, and *amicus* briefs concerning important consumer issues. I have been the director of the Project since its inception.

6. After we started the Consumer Justice Project, one of our first initiatives was the effort to end the abusive collection practices of the company then known as ACCS, which operated so-called "bad check restitution programs" under contract with local prosecutors' offices. Public Citizen first learned of these practices from Paul Arons, a private consumer attorney in Washington State who had already been representing consumer victims of ACCS for years. Our efforts have been encouraged by experienced consumer advocates at the National Consumer Law Center and the National Association of Consumer Advocates, as well as state attorney general offices and the Federal Trade Commission's Bureau of Consumer Protection. For a variety of reasons—both political and institutional—the FTC and the state attorneys general were either unwilling or unable to pursue ACCS directly.

7. Because Public Citizen Litigation Group has limited resources and handles only cases with a potential for broad public-interest impact, we carefully evaluate all potential cases before deciding to get involved. Among the factors we take into account are the chances of success; the resources that will be necessary; whether novel, important, or unsettled legal issues are involved; whether Public Citizen will contribute some expertise or relevant skills to the litigation; and, above all, the prospects for achieving an important public-interest benefit for consumers nationwide.

8. After our review of relevant documents, including ACCS's demand letters to consumers, several considerations convinced us that it was worth devoting Public Citizen's limited resources to advocating an end to ACCS's abusive collection practices.

First and foremost, we were convinced that ACCS's practices had a detrimental impact on low-income consumers. Innocent consumers on fixed incomes, particularly elderly consumers, were being threatened and harassed because of simple mistakes with their checkbooks and were being made to pay exorbitant collection fees under false threats of criminal prosecution. Second, we were convinced that litigation and advocacy against ACCS would implicate issues of profound public importance concerning whether the law-enforcement authority of the state may be privatized for civil debt collection. The cases would thus have a broad public-interest impact, even beyond the specific practices at issue. Third, we were convinced that ACCS's practices were in direct violation of several key provisions of the Fair Debt Collection Practices Act.

**Public Citizen's Role in Class-Action Litigation Against ACCS/NCG**

9.      Starting in 2006, Public Citizen joined as counsel for plaintiffs in statewide class-action lawsuits against ACCS in California, Florida, and Indiana. Our role in those lawsuits focused on litigating many of the novel legal issues that arose in those cases, particularly the constitutional issues. I briefed and argued two appeals arising out of the ACCS litigation. In both appeals, federal appellate courts rejected ACCS's attempt to invoke state sovereign immunity under the Eleventh Amendment. *See Del Campo v. Kennedy*, 517 F.3d 1070 (9th Cir. 2008) (affirming district court); *Rosario v. ACCS, Inc.*, 506 F.3d 1039, 1042 (11th Cir. 2007) (reversing district court). The National Consumer Law Center and the National Association of Consumer Advocates participated as *amici curiae* in support of our position on appeal.

10.     Public Citizen has continuously been involved in litigation and other advocacy addressing ACCS/NCG debt-collection practices since 2005. At every step, ACCS/NCG has failed to persuade courts that it should be immune from suit under the Fair Debt Collection Practices Act. Most recently, Public Citizen joined in representing the plaintiffs in the present lawsuit to address the continuation of ACCS's practices by NCG.

**Persistent Public Criticism of ACCS/NCG By Media, Regulators, Courts, and Others**

11.  Public Citizen's initial review of the ACCS/NCG collections scheme revealed a persistent pattern of scrutiny and criticism of the company's practices on the part of courts, regulators, the press, and consumer advocates—criticism that has continued to this day. *See* Exhibit 1 (collecting selected articles).

12.  In DeKalb County, Georgia, for example, ACCS's contract was canceled after an investigation revealed that the company was "charging a $125 fee to check bouncers to attend an 'educational class'" that was never held; "records show[ed] all but a handful of the hundreds of letters it sent to demand payment were for amounts" it was not authorized to collect; and the company made demands for payment "without first allowing check writers to make the check good," as Georgia law required. Soto, *DeKalb DA's Bad Check Plan Bounces*, Atlanta Journal-Constitution, May 14, 2001 (2001 WLNR 3945839).  Under public pressure, the County dropped the program. *Id.*

13.  In Illinois, a state court had appointed a special prosecutor to investigate ACCS. Schenk, *Illinois Court Determines San Clemente, Calif., Company Is Collection Agency*, News Gazette, Nov. 26, 2002 (2002 WLNR 9053480). ACCS has also been prosecuted by state regulatory agencies and investigated by state attorneys general. See Goodrich, *Bad Check Collection Firm Needs License, State Officials Say: Agency Files Complaint Against Company*, St. Louis Post-Dispatch, Feb. 14, 2001 (2001 WLNR 11350836); Dalmer, *Bad check cases bring warnings, little action: The small number of prosecutions may affect lawsuits against a collection agency*, Des Moines Register, May 20, 2001.

14.  In 2009, Pro Publica—an independent, non-profit newsroom that produces investigative journalism in the public interest—launched an investigation of ACCS/NCG in collaboration with CNN's Investigative Unit.  That investigation produced a barrage of critical coverage of ACCS/NCG's practices, including a segment on CNN's Lou Dobbs Tonight and reports in several national newspapers. *See, e.g., Bounced Checks: How Local District Attorneys Get a Cut of the Debt Collection Business*, http://www.propublica.org/feature/bounced-checks-how-local-das-get-a-cut-of-the-

debt-collection-business; Pro Publica, May 2, 2009; *Bounced-check collection deal draws fire*, CNN Special Investigations Unit, May 2, 2009, http://www.cnn.com/2009/US/03/02/siu.bad.checks/index.html; *District Attorneys Can Keep Cashing In On Check Fees*, Pro Publica, April 7, 2009, http://www.propublica.org/article/district-attorneys-can-keep-cashing-in-on-debt-collection-fees-0407.

### Public Citizen's Legislative Advocacy Against ACCS in the U.S. Congress

15. Public Citizen's work on check diversion abuses has also required federal legislative advocacy. *See* Exhibit 2 (collecting materials). In 2006, Public Citizen learned that ACCS was engaging in a lobbying effort to get Congress to pass a categorical exemption from the Fair Debt Collection Practices Act for "check diversion" firms. After spending hundreds of thousands of dollars on lobbying (more than $660,000 lobbying over three years, according to official lobbying disclosure reports), ACCS's lobbyists were initially able to get their amendment language inserted into a pending Financial Services Regulatory Relief bill.

16. In response, Public Citizen joined with the National Consumer Law Center (NCLC) and a coalition of consumer groups in opposing a categorical exemption. As part of that effort, Public Citizen and NCLC jointly organized national telephone press conferences and spoke with journalists about ACCS's practices, produced fact sheets for congressional offices, and met with members of Congress and their staffs to express the united opposition of the consumer rights community to ACCS's attempt to amend the FDCPA. Interestingly, our efforts were joined by the American Collectors Association (ACA), which was concerned that ACCS would gain a competitive advantage over other debt collectors if it were exempted from the FDCPA.

17. Following negotiations brokered by the majority and minority staffs of the Senate Banking Committee, between Public Citizen, the National Consumer Law Center, and the U.S. Public Interest Research Group on the one hand, and lobbyists for ACCS on the other hand, our efforts ultimately resulted in a defeat of ACCS's categorical exemption proposal. Instead, Congress passed a narrow conditional exemption that requires check diversion

companies to meet strict standards designed to protect consumers from abuse. The amendment also confirmed what we had maintained all along: that the FDCPA covers check diversion companies.

**Public Citizen's Legislative Advocacy Against ACCS in the California Legislature**

18. In 2008, Public Citizen's Consumer Justice Project again turned to legislative advocacy when we learned that ACCS's lobbyists had introduced a bill in the California Legislature—just a few weeks after the company's loss in the Ninth Circuit—that would have amended the California Penal Code to facilitate many of ACCS's illegal practices. *See* Exhibit 3 (collecting materials).

19. Former California State Senator Liz Figueroa, a member of Public Citizen's Board of Directors, testified against the bill on Public Citizen's behalf before the Committee on Public Safety of the California Assembly. Her testimony, including relevant newspaper articles, is in Exhibit 3, attached hereto.

20. In addition to Public Citizen, the bill was ultimately opposed by the American Civil Liberties Union, California Public Defender's Association, California Public Interest Research Group, California Reinvestment Coalition, Consumer Action, Consumer Federation of America, Consumer Federation of California, Consumers Union, National Association of Consumer Advocates, National Consumer Law Center, and the Privacy Rights Clearinghouse. In light of that opposition, the California Legislature declined to pass ACCS's bill. *See* Bill Analysis, Committee on Public Safety, California Assembly, *available at* http://info.sen.ca.gov/pub/07-08/bill/asm/ab_2601 2650/ab_2606_cfa_20080328_144350_asm_comm.html.

**ACCS's Strategic Bankruptcy and the Emergence of NCG**

21. In direct response to class actions against ACCS in four federal district courts (in California, Indiana, Florida, and Pennsylvania)—and on the eve of a summary-judgment

hearing in the Florida action—ACCS filed bankruptcy and liquidated itself. See Pro Publica, *District Attorneys Can Keep Cashing In On Check Fees*, http://www.propublica.org/article/district-attorneys-can-keep-cashing-in-on-debt-collection-fees-0407.

22. In April 2009, a Delaware bankruptcy judge allowed ACCS to sell its assets to defendant Levine Leichtman Capital Partners, "free and clear of all liens, claims, interests, and encumbrances." The ruling came despite a written objection from the Office of the United States Trustee, a division of the Department of Justice that enforces bankruptcy laws. "[I]t appears that the sale process will do nothing more than allow the Debtors to cleanse or launder its assets and its business free of the claims of the various class action plaintiffs," the trustee's office said. *Id.*

23. Although the company changed its name, it otherwise "emerge[d] from the bankruptcy virtually unchanged." *Id.* "All indications are that the same management team will remain in place," said Charles Jenkins, a lawyer for ACCS, as quoted by Pro Publica. "Jenkins said the bankruptcy filing was a reasonable legal strategy to ward off the consumer suits." *Id.*

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2010

*/s/ Deepak Gupta*
_____
Deepak Gupta